UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 12-2917 (PJS/FLN)

Ruthie Kennedy,

              Plaintiff,

       v.                                    **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,[1]
Acting Commissioner of Social Security,

              Defendant

_____

Daniel L. McGarry, Esq., for Plaintiff

Ana H. Voss, Assistant United States Attorney, for Defendant

_____

       Plaintiff Ruthie Kennedy seeks judicial review of the final decision of the Commissioner

of Social Security ("Commissioner"), who found Plaintiff was not disabled for the period between

May 15, 2009 and March 25, 2011.  This Court has jurisdiction over the claims pursuant to 42

U.S.C. § 405(g) and §1382(c)(3).  The parties submitted cross-motions for summary judgment.

[Doc. Nos. 18, 24.]  The matter was referred to the undersigned United States Magistrate Judge

for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the

reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be

granted for remand, and Defendant's motion for summary judgment be denied.

_____

[1] Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant
pursuant to Fed. R. Civ. P. 25(d).

1

# I.   INTRODUCTION

Plaintiff filed an application for supplemental security income on May 19, 2009, alleging a disability onset date of June 1, 2002.  (Tr. 138-43.)  Her application was denied initially and upon reconsideration.  (Tr. 76-79, 81-83.)  She requested a hearing before an ALJ, and the hearing was held on March 18, 2010.  (Tr. 84-86, 24-53.)  The ALJ denied Plaintiff's claim on March 25, 2011.  (Tr. 6-23.)  The Appeals Council denied review on September 13, 2012.  (1-5.)  The ALJ's March 25, 2011 decision therefore became the final decision of the Commissioner.  Plaintiff filed a complaint for judicial review on November 19, 2012.  The matter is now before this Court on cross-motions for summary judgment.

# II.   STATEMENT OF FACTS

## A.   Employment History

Plaintiff was 54 years-old when she filed her SSI application.  (Tr. 138.)  In 1991, she worked as a dietary aide in a nursing home for two months.  (Tr. 161.)  From 1998 through 2001, she worked in assembly.  (Tr. 161, 146.)  In 2002, she worked temporarily as a cook in a nursing home.  (*Id.*)  Plaintiff last worked assembling boxes in 2004.  (*Id.*)

## B.   Medical Records Before the SSI Application Was Filed

In 2008, Plaintiff received psychiatric treatment from Dr. Ali Ebrahimi at Associated Clinic of Psychology.  (Tr. 245-47.)  In June, Plaintiff reported that Ritalin was helpful because it made her feel more energetic, but she wanted another medication because she felt hyper at night.  (Tr. 247.)  Dr. Ebrahimi questioned how Plaintiff could have a supply of Ritalin remaining because she

should have run out since she was last seen.  (*Id.*)  He diagnosed organic personality disorder[2] with a history of ADHD.  (*Id.*)  In a subsequent visit, Dr. Ebrahimi noted that it was very difficult to get a history from Plaintiff.  (Tr.  246.)  She was taking an extra dose of Ritalin during the day and implied that it was because she was bored.  (*Id.*)  Trazadone and Vistaril made her too tired during the day, and Ritalin did not help with her tense feeling.  (*Id.*)  Dr. Ebrahimi recommended taking neurontin and Ritalin together.  (*Id.*)

Plaintiff also saw Psychologist Lisa Lorimer at Associated Clinic of Psychology.  (Tr. 242.)  In August 2008, Plaintiff was rather vague about her symptoms, and she was struggling with sobriety.  (*Id.*)  She complained that her son broke into her house to steal food.  (*Id.*)  Plaintiff said, "when I feel sick, I want to drink."  (*Id.*)  Plaintiff had a care-giver coming to her house to assist her every other day.  (*Id.*)  She would be starting a class for self esteem, in a program called SEED, later that month.  (*Id.*)  Lorimer diagnosed ADHD, organic personality disorder, and ETOH dependence.  (*Id.*)  The following month, Plaintiff told Dr. Ebrahimi that Ritalin was helpful, as she was getting out of the house more.  (Tr. 245.)  Plaintiff appeared to be on a lot of different medications from various providers, and Dr. Ebrahimi recommended consolidating.  (*Id.*)

Plaintiff received crisis psychiatric services for several days in December 2008.  (Tr. 389-400.)  She reported depression, fatigue and racing thoughts.  (Tr. 391.)  Upon mental status examination, she was restless, distractible, and her memory was impaired.  (Tr. 392.)  Plaintiff said she had been sober for a year, and she felt constant anxiety and depression.  (Tr. 399.)  However,

---

[2] Organic personality disorder is the traditional diagnostic category used to account for personality disturbances after traumatic brain injury.  J. Gagnon, M.A. Bouchard, C. Rainville *Differential Diagnosis between borderline personality disorder and organic personality disorder following traumatic brain injury*, Bull Menninger Clin., 2006 Winter; 701(1):1-28; PubMed available at  http://www.ncbi.nlm.nih.gov/pubmed/16545030

in her admission form, Plaintiff reported abusing alcohol and THC in the past year. (Tr. 394.) She also reported a history of mental health and chemical dependence hospitalization in 2005, and suicide attempt in 1984. (*Id.*) Her current crisis was precipitated by a conflict with her son, and she had a hallucination of a dog telling her to hurt her son. (Tr. 398.) Plaintiff was diagnosed with major depressive disorder, recurrent. (Tr. 395.) Upon admission, her symptom severity was rated three out of seven, where one was low and seven was high. (Tr. 391.)

Plaintiff saw Dr. Ebrahimi again in February 2009, with her usual complaint of needing something to help her relax during the day but also reporting that Ritalin helped her feel energetic. (Tr. 244.) Plaintiff was sleeping well, and Dr. Ebrahimi continued her on neurontin and Ritalin. (*Id.*) Plaintiff also saw Lisa Lorimer that month, and explained that she recently had a mental breakdown after her son caused her to lose her car. (Tr. 241). She was getting along with her daughter better now. (*Id.*) She had not used alcohol since August 2008. (*Id.*) Plaintiff felt fatigued and often weepy. (*Id.*) She was attending classes at SEED twice a week, for crafts and sewing. (*Id.*) Lorimer also thought Plaintiff was benefitting from attending a new church. (*Id.*)

The following month, Dr. Ebrahimi noted that Plaintiff, "in her usual vague manner" hinted at being "tense." (Tr. 243.) She wondered about increasing her dose of neurontin, and Dr. Ebrahimi agreed. (*Id.*) Plaintiff also needed forms completed for insurance. (*Id.*) Plaintiff wondered if she should get a second opinion about her diagnosis, as she had been applying for social security disability unsuccessfully since 1999. (*Id.*) Dr. Ebrahimi did not think there was an adequate diagnostic term for her condition. (*Id.*) Plaintiff's subjective distress was unchanged and was primarily described as "tenseness." (*Id.*) Her diagnostic history included bipolar, NOS; ADHD, NOS; alcohol dependence; and organic personality disorder. (*Id.*)

**C.    Medical Records After the SSI Application Was Filed**

**1.    Physical Impairments**

Plaintiff's motion for summary judgment focuses primarily on her mental impairments, but she was also treated for a number of physical impairments in 2009 and 2010, briefly summarized here.  In January 2009, Plaintiff was treated for heartburn, hypertension and chronic anxiety.  (Tr. 257, 308-09.)  In at least one instance, she had documented diverticulitis.  (Tr. 257.)  Her high blood pressure was probably the cause of her mild headaches.  (Tr. 308.)  She was also diagnosed with atherosclerotic changes, ventral hernia, and cardiac enlargement.  (Tr. 369.)

Plaintiff went to an emergency room for treatment of abdominal pain on October 22, 2010. (Tr. 369-83.)  One month later, Plaintiff went to see a psychiatrist at Regions Hospital, and he sent Plaintiff to the emergency room for treatment of her high blood pressure and abdominal pain.  (Tr. 360.)  She had not taken her blood pressure medication that day because she was running errands for the holidays.  (Tr. 356.)  Plaintiff's chronic abdominal pain was treated with Vicodin.  (Tr. 356-58.)  The next day, Plaintiff's abdominal pain was better.  (Tr. 353.)

On December 23, 2010, Plaintiff went to an emergency room with chest pain and demanded Vicodin, giving conflicting stories about why she needed it.  (Tr. 339.)  Her blood pressure was high, but she was not dizzy or lightheaded.  (Tr. 339-40.)  She said that she wanted to be pain-free so she could care for her grandchildren.  (Tr. 340.)  Plaintiff was encouraged to stay for observation but said she had more important things to do.  (*Id.*)  Plaintiff was given a prescription for Ultram, and she was talkative, smiling and pain-free on discharge.  (Tr. 339.)

### 2.    Mental Impairments

Plaintiff returned to Dr. Ebrahimi in December 2009, after an eight-month absence.  (Tr. 302.)  Her presentation was unchanged, and she was not taking her medication in the manner prescribed.  (*Id.*)  She reported vague symptoms of depression and tension.  (*Id.*)  She explained that she wanted medication to make her feel more outgoing.  (*Id.*)  Dr. Ebrahimi diagnosed bipolar disorder, NOS, and prescribed Cymbalta with Ritalin.  (*Id.*)  Plaintiff also saw a new psychologist at Associated Clinic.  (Tr. 299-300.)  Plaintiff had watched her grandchildren the previous week, with the help of her son.  (*Id.*)  Her appetite and sleep were poor.  (*Id.*)  She was having thoughts of self harm and was starting to hear voices about being no good.  (*Id.*)  She had used alcohol over the summer but not since then.  (*Id.*)  Plaintiff was referred for partial hospitalization.  (*Id.*)

A few months later, Dr. Ebrahimi wondered what benefit Plaintiff was getting from taking neurontin and Ritalin.  (Tr. 301).  She had difficulty describing her symptoms, and her mental status was unchanged.  (*Id.*)  Dr. Ebrahimi diagnosed anxiety disorder, NOS and organic personality disorder.  (*Id.*)  In March 2010, Dr. Ebrahimi found it difficult to learn from Plaintiff what medications she was taking and how she was taking them.  (Tr. 319.)  She was taking neurontin by "nibbling on it" throughout the day, and she believed that her medications were capable of treating all of her bad feelings.  (*Id.*)  Plaintiff requested to go back on Cymbalta and Ritalin.  (*Id.*)  Her mental status was unchanged, and Dr. Ebrahimi diagnosed alcohol-related cognitive effect with history of cognitive dulling,[3] and history of bipolar disorder.  (*Id.*)

---

[3] The DSM-IV-TR describes a number of alcohol-induced disorders, including alcohol-induced persisting dementia, Diagnostic Code 291.2, and alcohol-related disorder, NOS, Diagnostic Code 291.9.  *See*, Appendix, DSM-IV-TR Classification, available at http://wps.prenhall.com/wps/media/objects/219/225111/CD_DSMIV.pdf   None of the disorders are called alcohol-induced cognitive effect.  *Id.*

Plaintiff underwent a consultative psychological examination with Dr. Alford Karayusuf, regarding her application for social security disability benefits, on September 3, 2009. ( Tr. 265-67.)  She had been in prison for assault from 1984 to 1986.  (Tr. 265.)  She used crack cocaine every day until 1996.  (*Id.*)  Plaintiff's depression began in 1999, and she felt no joy or enthusiasm for ten years.  (*Id.*)  She was hospitalized in 2005 for major depression and again for several days in January 2009.  (*Id.*)  She also drank a liter per day, causing blackouts and withdrawal tremors, until she stopped in 2006.  (*Id.*)

Presently, Plaintiff was despondent with occasional suicidal thoughts, and said she would welcome death.  (*Id.*)  She slept poorly, her appetite fluctuated, her concentration and memory were diminished, she was anxious and worried with racing thoughts; and she felt useless, worthless, hopeless and abandoned by her family.  (*Id.*)  She normally lived alone, but she was staying with her daughter because she was "between homes."  (Tr. 266.)  Plaintiff stayed in bed twenty hours per day.  (*Id.*)  She bathed once or twice a week.  (*Id.*)  She cooked and grocery shopped for herself, getting rides when needed.  (*Id.*)  She did housework slowly due to the severity of her depression.  (*Id.*)  She went to church once a week but could not remember what it was about.  (*Id.*)  She went to the movies every two months but could not concentrate.  (*Id.*)  She had the television on constantly for company but did not pay attention to it.  (*Id.*)  Occasionally, she took her grandchildren to the park.  (*Id.*)  She had no friends.  (*Id.*)

On mental status examination, Plaintiff was fully oriented, with good immediate recall. (*Id.*)  She could not subtract serial sevens, and her recent recall was impaired.  (*Id.*)  She reported auditory hallucinations occurring on rare occasions, the last in January 2009, when a voice told her to kill her son.  (*Id.*)  She had no delusions, but she was mistrustful.  (*Id.*)  Her intelligence was

dull normal.  (*Id.*)  She had good posture, and she was polite, spontaneous and cooperative.  (*Id.*)
She looked tired and exhibited some mild psychomotor retardation.  (*Id.*)  Her tension was mild to
moderate, with relevant, unpressured speech, and subdued affect.  (*Id.*)  She was tearful and
moderately depressed.  (*Id.*)  Dr. Karayusuf diagnosed recurrent, moderate major depression and
polysubstance dependence in remission.  (*Id.*)  He opined that Plaintiff was able to understand,
retain and follow simple instructions; she was restricted to brief, superficial, infrequent
interactions with fellow workers, supervisors and the public; and she was restricted to simple,
routine, repetitive, concrete, tangible tasks.  (Tr. 267.)

The record contains an intake assessment summary dated April 7, 2010, from Plaintiff's
evaluation for a day treatment program at Pathways Counseling Center ("Pathways").  (Tr. 489.)
Plaintiff's drug of choice was alcohol, and she had been sober since the previous summer.  (*Id.*)
Her mental illness was bipolar disorder.  (*Id.*)  Plaintiff was close to her three children but stressed
by her son's legal issues.  (*Id.*)  She looked forward to beginning day treatment.  (*Id.*)

Andrea Mousel, LMFT,[4] evaluated Plaintiff for Adult Mental Health Rehabilitative
Services on May 5, 2010.  (Tr. 401-08.)  Plaintiff reported that depression was affecting all areas
of her life, and her tendency to isolate heightened her mental health symptoms.  (Tr. 401.)  She
reported having panic attacks, almost daily, related to going in her basement, going near certain
doors and being around certain people.  (*Id.*)  Her depression also seriously limited her
functioning.  (*Id.*)  Examples of her impaired functioning included no motivation to make or return
calls; she was too overwhelmed to leave home or do her laundry; she had difficulty remembering;
her depression caused alcohol cravings; she lost her last job because she could not keep up

---

[4] LMFT stands for licensed marriage and family therapist.  Available at
http://www.acronymfinder.com/Licensed-Marriage-and-Family-Therapist-(LMFT).html

concentration and pace; she struggled to attend classes the last year; she lacked energy to be around others and lacked concentration to engage in conversation; she had difficulty getting along with family and finding solutions to problems; when depressed she did not cook, clean or bathe and had trouble sleeping at night; she worried about her blood pressure; when depressed, she had no energy or motivation to care for medical needs; when depressed, she was overwhelmed by her financial state and had no energy to deal with it; and she was overwhelmed by the need to use public transportation.  (Tr. 410-14.)

Mousel noted Plaintiff was appropriately dressed and groomed and had good independent living skills.  (Tr. 404.)  Her speech was soft but unremarkable.  (*Id.*)  She was sad and anxious. (*Id.*)  She had no doubt she would drink again.  (Tr. 402.)  Plaintiff's past diagnoses included major depressive disorder, schizophrenia, anxiety and panic disorder.  (*Id.*)  She had three psychiatric hospitalizations, and her mental health was affected by drug and alcohol use in the past.  (*Id.*)  She had been sober for eight months with one recent slip of marijuana use.  (*Id.*) Plaintiff had been married twice, but her marriages only lasted a month.  (*Id.*)

Plaintiff's primary stressors were her children, trying to stay sober, and dealing with panic attacks that made it difficult for her to leave the house and to walk across bridges.  (*Id.*)  She also feared homelessness, and her finances were very limited.  (*Id.*)  Plaintiff did not feel that going back to work was out of the question for the future, but she was presently too slow because of her medications.  (*Id.*)  Mousel made the following comments in her functional assessment of Plaintiff: depression and panic attacks inhibited performance in all areas; she had some sobriety but a long history of drug and alcohol abuse; she presently had no friends; she had difficulty setting appropriate boundaries; independent living and self care were very difficult when depressed; she

needed financial assistance and wanted help learning about public transportation services.  (Tr. 407.)

Mousel diagnosed severe major depressive disorder with psychotic features and panic disorder without agoraphobia.  (Tr. 408.)  She recommended that Plaintiff receive services, and one of those services was home and community visits, one to three times per week, from a mental health practitioner, Teresa Moore.  (Tr. 409.)  Plaintiff's rehabilitation plan involved managing symptoms of depression and anxiety, relapse prevention skills, self-esteem tools, conflict management skills, and relaxation skills.  (Tr. 410-17.)

When Plaintiff started the program the following week, she told her counselor, Patricia Kough, that she feared relapsing.  (Tr. 488.)  She did not trust people, and she isolated herself.  (*Id.*)  However, she appeared motivated to improve.  (*Id.*)  She started feeling more comfortable in group therapy and said she wanted to detach herself from the chaos of her children's lives.  (*Id.*)  Kough noted that Plaintiff was sober, medication compliant, soft spoken, motivated, and likeable.  (*Id.*)  On April 26, 2010, Plaintiff admitting using THC a few days earlier.  (*Id.*)  She had isolated herself and skipped church.  (*Id.*)  She agreed to read her bible daily and write in her journal.  (*Id.*)  Plaintiff continued to have strong urges to use alcohol, and she isolated in her apartment to avoid drinking, but she had engaged in sober activities with her daughter over the weekend.  (Tr. 487.)

In day treatment, Plaintiff's self esteem and self confidence were slowly improving.  (*Id.*)  She enjoyed spending time with her sisters, but she also felt alone because her old friends were drinking friends.  (*Id.*)  Her counselors recommended church and AA for social support, but Plaintiff's depression and/or social discomfort made her reluctant.  (*Id.*)  On May 20, 2010, Plaintiff said she felt really good when she attended group treatment.  (Tr. 486.)  Her depression

and isolation had diminished.  (*Id.*)  In June 2010, Plaintiff spent positive, sober time with family members, and she went to church, went fishing, and gardened.  (Tr. 485.)  Her depression was mild.  (*Id.*)  Moore also noted that Plaintiff was overwhelmed by refilling her medications and completing paperwork, and this caused her to isolate.  (Tr. 457.)

In group treatment in July 2010, Plaintiff reported improvement in her depression, and she had increased her social activity.  (Tr. 483-84.)  Moore, however, noted Plaintiff struggled to complete tasks, felt easily overwhelmed, and gave up and isolated when things were too hard for her.  (Tr. 452-55.)  Conflict with her children caused Plaintiff to have cravings to drink.  (Tr. 455.)  Plaintiff had missed some appointments because she felt ill after medication adjustments.  (Tr. 483-84.)  She continued to struggle to get her medications from one source.  (Tr. 483.)

On July 27, 2010, Plaintiff denied depression and anxiety.  (*Id.*)  A few days later, Plaintiff was cooperative and upbeat in group therapy.  (Tr. 483.)  However, she was anxious and overwhelmed by the task of writing a letter when she saw Moore later the same day.  (Tr. 451.)  Plaintiff said she could not control her worrying.  (*Id.*)  In group therapy for the remainder of August, Plaintiff reported little or no depression.  (Tr. 481-82.)  She attended church and gardened.  (Tr. 482.)  Her biggest stressor was her finances.  (Tr. 481.)  Plaintiff admitted to drinking a beer on September 1, 2010.  (*Id.*)

On September 9, 2010, Moore noted that Plaintiff struggled with opening mail and mailing bills out on time.  (Tr. 439.)  When Plaintiff was depressed, she threw her bills out.  (*Id.*)  She needed coaching for her anxiety with opening mail.  (*Id.*)  At the end of the session, Plaintiff's anxiety had decreased.  (*Id.*)  The following day, in group treatment, Plaintiff reported mild depression, but she had markedly improved her isolation by attending church and engaging in sober

activities with family.  (Tr. 480.)  A few days later, Plaintiff was upset after arguing with her son,

and she wanted to go home instead of staying for therapy.  (Tr. 440.)  The next week she reported a

good mood with no depression or mania.  (Tr. 479.)

Plaintiff told Moore, on October 1, 2010, that her son was stressing her out, and she wanted

to go home early.  (Tr. 442.)  Plaintiff was in tears because her son told her she was incapable of

doing anything without him.  (*Id.*)  On a positive note, she had been attending church and engaging

in sober activities with her daughter and grandchild.  (Tr. 479.)  A few days later, familial stress

was causing Plaintiff to have strong urges to drink, and she felt overwhelmed but denied depression

in group therapy.  (Tr. 443, 479.)  On the same day, however, Plaintiff told Moore that she was

depressed, causing her to have difficulty completing tasks, for example, her dirty clothes were

piling up.  (Tr. 443.)  The next week, Plaintiff continued to struggle to complete tasks and was

easily overwhelmed, but she felt much better after she was able to make some phone calls with

coaching from Moore.  (Tr. 444.)  Plaintiff told her group that she felt self confident and positive.

(Tr. 478.)  She was attending church, calling other group members, and doing crafts at home.  (*Id.*)

The groups were helping her overcome her social anxiety.  (*Id.*)  But, she continued to avoid

attending AA.  (*Id.*)

On October 28, 2010, Plaintiff told her group she had sixty days sobriety.  (*Id.*)  Depression

and mania were alcohol triggers for her.  (*Id.*)  When she isolated in her home, she became bored or

lonely.  (*Id.*)  She graduated from day treatment on November 5, 2010.  (Tr. 462, 477.)  She

continued to meet with Moore, who noted Plaintiff was overwhelmed at the prospect of making

phone calls and completing paperwork.  (Tr. 447.)  Plaintiff found it very helpful to have assistance

from Moore with tasks, and she appeared calmer after her meetings with Moore.  (Tr. 447-48.)

Moore noted Plaintiff struggled to focus on anything when she was upset and worried.  (Tr. 448.)

For example, Plaintiff was too upset by her children, so she did not call the electric company to set

up a payment plan to keep her electricity on.  (*Id.*)

On November 22, 2010, Moore thought that Plaintiff seemed more at ease.  (Tr. 430.)

Plaintiff admitted she would be better off spending less time with her family, especially for her goal

of staying sober over thanksgiving.  (*Id.*)  Moore discovered that Plaintiff had gotten prescription

medication from someone she had attended day treatment with, and Plaintiff denied knowing it was

a prescription drug.  (*Id.*)  A week later, Plaintiff admitting getting Campral[5] from a friend, whom

she begged for the medication because her insurance would not cover it.  (Tr. 431.)   Plaintiff

agreed to give the medication back, but she was upset with Moore.  (*Id.*)  At the next session,

Plaintiff appeared more at ease but admitted having cravings to drink.  (Tr. 433.)  She was not

sharing what was happening in her life, as evidenced by contradictory answers to the same

question.  (*Id.*)

On January 27, 2011, Plaintiff seemed overwhelmed, which Moore attributed in part to the

fact that Plaintiff's daughter and a friend had left Plaintiff with three children to watch for three

weeks.  (Tr. 437.)  Plaintiff had suicidal thoughts of running her car off a road or running into

someone else, but she had no plan to act on her thoughts.  (*Id.*)  On February 16, 2011, Moore noted

Plaintiff was antsy and unfocused, needing to be redirected several times to the topic.  (Tr. 438.)

Plaintiff had also missed appointments to go to the movies with Moore.  (*Id.*)  At the next session,

Moore would assist Plaintiff in preparing for her SSI hearing.  (*Id.*)

---

[5] Campral is used to help alcohol-dependent patients keep from drinking alcohol.  It is believed
to work by restoring the natural balance of neurotransmitters in the brain.  Drugs & Medications
- campral - oral, WebMD, available at
http://www.webmd.com/drugs/drug-92241-campral+oral.aspx

### D.    State Agency Physician Opinions

Dr. B.R. Horton reviewed Plaintiff's medical records upon initial review of her application for social security disability benefits on September 30, 2009, and he completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment. (Tr. 269-82, 284--86.) He opined that Plaintiff had an organic mental disorder and an affective disorder, causing moderate limitations in daily activities, social functioning, and maintaining concentration, persistence or pace. (Tr. 269-82.) He granted weight to Dr. Karayusuf's opinion and noted that Plaintiff is able to get rides, use public transportation, do chores with prompts, prepare some meals, maintain hygiene, shop, handle money, and socialize at times. (Tr. 286.) She had varied comprehension and attention. (*Id.*) He believed that Plaintiff's statements regarding her functioning were credible. (*Id.*) He opined that she could "do srt"[6] within physical parameters, but "preferably not in an environment where frequent and intense socializing is pertinent to the job function." (*Id.*) Dr. James Alsdurf reviewed Plaintiff's social security disability file on February 25, 2010, and affirmed Dr. Horton's opinion. (Tr. 313-15).

### E.    Function Reports

Plaintiff completed an undated function report in support of her social security disability application. (Tr. 171-78.) She reported that she lived alone in an apartment and spent her days eating, sleeping and watching television. (Tr. 171.) She was mostly depressed but had some days with high mood. (*Id.*) Her ability to cook depended on her energy level. (Tr. 173.) She tried to keep her house clean but moved slowly and needed help and encouragement. (*Id.*) She was too drowsy from medication to do yard work. (Tr. 174.) She did not drive because she was always

---

[6] The Court assumes "srt" stands for simple, repetitive tasks, which the ALJ incorporated into his RFC finding.

medicated.  (*Id.*)  She walked, got rides and used public transportation.  (*Id.*)  She went shopping

once a month.  (*Id.*)  Her hobbies were television, sewing and hiking.  (Tr. 175.)  She went to

church on Sundays but did not spend time with others.  (*Id.*)  Her medications affected her focus

and concentration, and she could pay attention for a few minutes.  (Tr. 176.)  She sometimes

finished what she started, and sometimes followed written instructions well.  (*Id.*)  She got along

with authority figures very well and never lost a job due to inability to get along with others.  (Tr.

177.)  She did not handle stress or changes in routine well because she had high anxiety.  (*Id.*)

Plaintiff's son, Rahmiah Kennedy, completed a third-party function report on June 12, 2009,

in support of Plaintiff's social security disability application.  (Tr. 179-86.)  He stayed with his

mother from time to time to help her out.  (Tr. 179.)  During the hearing, Plaintiff spent her time

sleeping, and she was spaced out from her medication.  (*Id.*)  If she was not sleeping too much, she

was unable to sleep.  (Tr. 180.)  She did not have trouble with personal grooming, and she was able

to cook daily, albeit slowly.  (Tr. 180-81.)  On bad days, however, she could not do anything.  (Tr.

181.)  She was always depressed, and her ability to do chores depended on her mood.  (Tr. 181-82.)

She went outside every day and to church weekly but no longer engaged in her hobbies of fishing,

swimming, sewing or reading.  (Tr. 182-83.)  She did not have many friends but talked to her sisters

on the phone two or three times a week.  (Tr. 183-84.)  She was always worried and did not handle

stress well.  (Tr. 185.)

## F.   Administrative Hearings

Plaintiff, represented by counsel, testified at a hearing before an ALJ on March 1, 2011.

(Tr. 24-45.)  Plaintiff explained that she could no longer work because she had depression in spurts

and had been diagnosed with bipolar disorder.  (Tr. 31.)  She was on medication and could not

focus, concentrate or remember things.  (*Id.*)  Plaintiff tried volunteering to see if she could go back

to work but depression and fatigue got in her way.  (Tr. 31-32, 40-41.)  Plaintiff had volunteered to

take someone shopping, but then she had a panic attack at the store.  (Tr. 41.)  Her panic attacks

sometimes occurred daily, other times, once a week.  (*Id.*)  Plaintiff had difficulty leaving her house

for two reasons, anxiety and trying to maintain sobriety.  (Tr. 42.)  Many people were using in her

neighborhood.  (*Id.*)  Plaintiff often lacked motivation to get out of bed.  (*Id.*)  She had no idea what

it was to be happy.  (*Id.*)

Plaintiff has a driver's license, but her counselor gave her a ride to the hearing.  (Tr. 32.)

She grocery shops on her own at times, otherwise she has to rely on others.  (Tr. 32, 42.)  Plaintiff

lived alone, although she had mostly been homeless.  (Tr. 32-33.)  She had relapses with drugs or

alcohol about once a year.  (Tr. 33.)  She had one beer in May, and last became intoxicated in

September 2009.  (Tr. 34.)

Plaintiff had stayed at Diane Ahrens crisis residence[7] several times when she became

mentally unstable, but she had not been in a psychiatric ward of a hospital in 2009 or later.  (Tr. 35-

36.)  Plaintiff lived alone in the same apartment for the last two years and did her best to keep it

clean.  (Tr. 35.)  Plaintiff enjoyed being with her grandchildren, aged two and three, and they

sometimes spent the night with her.  (Tr. 35-36.)  Whether Plaintiff was having a good day or not,

she had her grandchildren overnight at least once a month.  (Tr. 36.)  When Plaintiff could not leave

her house, she enjoyed using a computer, primarily for the Internet and reading emails, but she did

not like to type.  (Tr. 36-37.)  Plaintiff's oldest daughter sometimes took Plaintiff out to eat.  (Tr.

---

[7] The Diane Ahrens Crisis Residence serves adult with mental illness who are experiencing a
psychiatric crisis and may also have a chemical dependency diagnosis.
http://www.peopleincorporated.org/programs-services/mi-cd/diane-ahrens-crisis-residence/

37.)  Plaintiff had gone to a play at her church the previous week.  (Tr. 37-38.)  She tried to go to church weekly but sometimes "had to fight the devil" to get out of her house, which she explained was her anxiety.  (Tr. 38.)  She also had trouble sitting through church if she had a burst of energy and could not sit still, which she attributed to ADHD.  (Tr. 44.)  Plaintiff also liked to do crocheting, crafts and arts.  (Tr. 38.)  She made baby slippers and did word puzzles.  (Tr. 39.)  She enjoyed working with her hands.  (Tr. 39-40.)  It had been years since she felt well enough to look for a job.  (Tr. 40.)

Plaintiff was not able to explain her symptom of racing thoughts very well.  (Tr. 42-43.) She was not able to say how often she heard voices but suggested it occurred when things were not going well for her, like when she was homeless or when she had no money at the end of the month. (Tr. 43.)  In the past, voices told her to drive off a cliff or hurt someone.  (*Id.*)  She still had suicidal thoughts and did not feel alive most of the time.  (*Id.*)  She worried that her hypertension would cause a stroke or heart attack and did not think it was safe for her to get excited.  (Tr. 45.)  She felt like a time bomb.  (*Id.*)

Dr. Karen Butler testified at the hearing as a psychological expert.  (Tr. 45-49.)  She reviewed the diagnoses in Plaintiff's medical records but discounted ADHD, organic personality disorder, cognitive dulling and alcohol-related cognitive effect because she did not find any confirming tests or particular signs or symptoms for those diagnoses.  (Tr. 46-47.)  The other diagnoses were major depression, recurrent and moderate; anxiety disorder, NOS; history of bipolar disorder; and history of polysubstance dependence.  (Tr. 46.)  Dr. Butler did not find Plaintiff to meet the severity level of the paragraph B criteria for the mental impairments listings.  (Tr. 47.) She rated Plaintiff mildly impaired in daily activities and moderately impaired in social functioning and in maintaining concentration, persistence or pace, with no episodes of decompensation.  (Tr.

47-48.)  She noted that Plaintiff was referred for partial hospitalization but did not see any records of that occurring.  (Tr. 48.)  Dr. Butler opined that Plaintiff's psychological impairments resulted in work restrictions of simple, unskilled work with no rapid pace, no high production goals, and brief and superficial contact with others.  (Tr. 49.)

Bill Rutenbeck testified at the hearing as a vocational expert.  (Tr. 49-52, 227.)  The ALJ asked Rutenbeck a hypothetical vocational question assuming a person of Plaintiff's age, education[8] and work experience who had no exertional limitations but was limited to unskilled work involving only simple repetitive tasks, low stress work without fast paced activity or high production quotas. (Tr. 50.)  The person was also limited to brief and superficial interactions with the public, co-workers and supervisors.  (*Id.*)  Rutenbeck testified that the person described could not perform Plaintiff's past work as a box assembler, which was semi-skilled.  (Tr. 51.)  The person, however, could perform the occupations of janitor/cleaner,[9] dining room attendant[10] and kitchen helper.[11] (*Id.*)

For a second hypothetical question, the ALJ added to the first hypothetical that the individual's psychiatric problems would cause her to be off task 20% of the time.  (Tr. 52.) Rutenbeck testified that such a person could not perform the jobs he had identified.  (*Id.*) Furthermore, he testified that a person could only miss work two days per month and remain employed.  (*Id.*)

---

[8] Plaintiff has a high school equivalency degree.  (Tr. 50.)

[9] Dictionary of Occupational Titles ("DOT")  Available at http://www.occupationalinfo.org/  *See* DOT Code, Code 381.687-010.  There are 40,000 such jobs in Minnesota, according to the VE.

[10] DOT Code 311.677-018, with 2,700 jobs in Minnesota.

[11] DOT Code 318.687-010, with 9,400 jobs in Minnesota.

### G.     ALJ's Decision

On March 25, 2011, the ALJ issued an unfavorable decision, concluding that

1.     The claimant has not engaged in substantial gainful activity since May 15, 2009, the application date (20 CFR 416.971 *et seq.*).

2.     The claimant has the following severe impairments: major depressive disorder, history of bipolar disorder; anxiety disorder, NOS, and history of polysubstance dependence.  (20 CFR 416.920(c)).
. . .

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).
. . .

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to work involving only simple, repetitive tasks.  She is limited to low stress work, which I define in this case as work that does not involve fast paced activity or high production quotas.  She is limited to brief and superficial interaction with the public, co-workers and supervisors.
. . .

5.     The claimant is unable to perform any past relevant work (20 CFR  416.965).
. . .

6.     The claimant was born on May 1, 1955, and was 54 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed  (20 CFR 416.963).

7.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and the residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, 416.969(a)).

. . .

10.   The claimant has not been under a disability, as defined in the Social Security Act, since May 15, 2009, the date the application was filed (20 CFR 416.920(g)).

(Tr. 11-19.)

At step three of the evaluation, the ALJ agreed with Dr. Butler's opinion that Plaintiff's mental impairments did not meet or equal the severity of a listed impairment because she did not have the required severity under the "paragraph B criteria." (Tr. 12.) Plaintiff had only a mild restriction in activities of daily living because she lived alone in an apartment, she liked to keep her home clean, she did not have support from her family, she drove a car, shopped, used a computer, read, crocheted, did word puzzles, and liked to keep busy using her hands. (*Id.*) She had only moderate difficulties in social functioning because she went with her daughter out to eat and to movies, she tried to attend church and recently went to a play, she talked to her sisters on the phone, and she reported going to the movies once every two months. (*Id.*) She also had only moderate difficulties in concentration, persistence or pace, based on her mental status examination with Dr. Karayusuf. (*Id.*) She did not have any episodes of decompensation of extended duration, hallmarked by psychiatric hospitalization, enrollment in day treatment or increase in outpatient psychotherapy for an extended period. (*Id.*) The "paragraph C" criteria of the listed impairments were not present. (Tr. 13.)

In arriving at the RFC determination, the ALJ began by considering Plaintiff's subjective complaints that excitement caused her to have high blood pressure, depression caused her to feel suicidal, and her medications caused to her move slowly and resulted in her job loss.  (Tr. 14.) Plaintiff said her concentration and focus were limited by her biolar disorder and fatigue.  (*Id.*)  She had many panic attacks and had difficulty leaving the house due to anxiety and because she needed to avoid her neighborhood to remain sober.  (*Id.*)  She watched her grandchildren once a month, but she had help from a neighbor, and her children would pick the kids up if Plaintiff could not handle them.  (*Id.*)  The ALJ discounted these allegations, noting that Plaintiff's mental status examinations were unremarkable except for depressed mood.  (*Id.*)  Plaintiff only sought counseling and medication on an as needed basis rather than a regular basis.  (*Id.*)

Although Plaintiff "voiced" suicidal thoughts, the ALJ found little evidence that she planned to carry through because she was not hospitalized or referred for more extensive therapy. (Tr. 15.)  After the hearing, Plaintiff submitted evidence that she stayed at a crisis center in December 2008 and attended more than eighty days in a day treatment program for substance abuse, beginning in April 2010.  (*Id.*)  Plaintiff continued to have episodes of drug and alcohol abuse with relapses during the relevant time.  (*Id.*)

The ALJ found Plaintiff's allegation of disability not fully credible because the objective findings were inconsistent with her allegations.  (*Id.*)  He found that she had a "high level of daily activities and independence."  (*Id.*)  She lived alone without any particular help in maintaining the residence.  (*Id.*)  She attended classes in previous years, learned to type, and loved learning to use a computer.  (*Id.*)  She was actively involved in her children's and grandchildren's lives.  (*Id.*)  The ALJ found Plaintiff's allegation of constant symptoms was not supported by the record.  (*Id.*)  He also discounted her credibility because she gave very brief responses at the administrative hearing

21

and volunteered very little additional information.  (Tr. 15-16.)  She could not quantify her panic

attacks, and her records showed she had difficulty providing a convincing history to her providers.

(Tr. 16.)  She went to her doctor infrequently and missed appointments at Pathways Counseling

Center.  (*Id.*)  She did not require hospitalization.  (*Id.*)

The ALJ found that it weighed in Plaintiff's favor that she was prescribed and took

appropriate medications, but he also found the medications were relatively effective.  (*Id.*)  The

record did not support her allegation of constant fatigue, particularly the records of Dr. Ebrahimi,

suggesting her Ritalin was effective.  (*Id.*)  The ALJ also noted Plaintiff did not take her Ritalin as

prescribed.  (*Id.*)  He concluded that Plaintiff's subjective complaints were caused by stress in her

family relationships and her struggle to maintain sobriety.  (*Id.*)

The ALJ cited evidence that Plaintiff continued to have episodes of ongoing drug and

alcohol abuse, more than she admitted.  (Tr. 15.)  She had difficulty managing triggers to use

alcohol, and there was evidence she abused prescription drugs by obtaining another person's

prescription for her use.  (*Id.*)  The ALJ concluded "[t]hese reports and statements show the

claimant continues to struggle with drug and alcohol abuse and suggest that her alleged limitations

are not solely from mental impairments."  (*Id.*)  The ALJ also discounted Plaintiff's credibility due

to her poor work history, which suggested her unemployment may not be  due to medical

impairments.  (*Id.*)

The ALJ gave significant weight to Dr. Butler's opinion because it was generally consistent

with the evidence of record.  (Tr. 17.)  He also accorded great weight to Dr. Karayusuf's opinion,

also finding it generally consistent with the evidence of record.  (*Id.*)  The ALJ did not agree with

the state agency psychological consultants' opinions that Plaintiff was moderately limited in daily

activities, finding she was only mildly limited.  (*Id.*)  The ALJ otherwise agreed with their opinions

of Plaintiff's functional limitations.  (*Id.*)  The ALJ considered the report of Plaintiff's son and found it was generally consistent with the evidence of record.  (*Id.*)  In sum, the ALJ said his RFC finding was consistent with the objective medical findings, the opinion of the medical expert, and claimant's numerous reports of improved pain and functioning.  (*Id.*)

### III.   CONCLUSIONS OF LAW

#### A.   Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. 405(g); *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  *Moore ex rel Moore v. Barnhart*, 413 F.3d 718, 721 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision.  *Vandenboom v. Barnhart*, 421 F.3d 745, 749 (8th Cir. 2005).

#### B.   Discussion

Plaintiff made three arguments in support of summary judgment.  First, she contends the ALJ erred in discounting her credibility.  Second, she raises various objections to the ALJ's RFC determination, including that Dr. Butler never reviewed the Pathways records before giving her RFC

opinion.  Third, Plaintiff asserts the ALJ failed to restrict Plaintiff to work with infrequent interaction with others in the hypothetical vocational question to the VE, resulting in error because a person who cannot frequently interact with others cannot perform the job of dining room attendant.

The Commissioner responded that the ALJ's credibility analysis was proper based on Plaintiff's mental status examinations, improvement in her depression and anxiety by the end of 2010, her poor work history, her high level of daily activities, her sporadic treatment, and causes other than mental impairments contributing to her inability to work.  The Commissioner asserts Mousel's opinion was accommodated by the ALJ's RFC finding.  Furthermore, the Commissioner asserts it is immaterial that Dr. Butler did not review the Pathways records because the records showed Plaintiff's improvement. Additionally,  Plaintiff's counsel wanted to go forward with the hearing knowing the Pathways records had not been received by the SSA or reviewed at the time of the hearing.  Finally, the Commissioner asserts Plaintiff's step five argument is immaterial because the ALJ identified three jobs that were consistent with the RFC finding, and only one of those jobs, dining room attendant, potentially required social interactions beyond the ALJ's RFC finding.  In other words, if there was an error at step five, it was harmless.

### 1.    Credibility

Plaintiff contends the ALJ's credibility analysis was backward because the ALJ found:  "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  In other words, the ALJ determined the RFC before considering the credibility of the claimant's subjective complaints.  The Eighth Circuit has dismissed this argument as "semantics and nothing more." *Kamann v. Colvin*, 721 F.3d 945, 951 (8th Cir. 2013).  When the ALJ's decision is read as a whole, it is clear that the ALJ considered the credibility factors in arriving at

Plaintiff's RFC finding.  Here, there were limited objective mental health findings, primarily in mental status examinations, to support the limitations alleged by Plaintiff.  Therefore, the ALJ addressed the *Polaski* factors in assessing Plaintiff's subjective complaints of severe depression and anxiety symptoms preventing her from leaving her house or concentrating on and completing tasks with persistence or pace.  The ALJ considered the providers' opinions, medication effectiveness, precipitating and aggravating factors, effectiveness of other treatment, work history, and third party reports.  These factors were part of the ALJ's  RFC analysis.  Therefore, Plaintiff's claim has no merit.

The next issue is whether the ALJ's credibility analysis is supported by the record.  Plaintiff contends the ALJ overstated her daily activities, and the record shows she cannot do things when she is depressed, and that she has help while watching her grandchildren.  Similarly, Plaintiff asserts the ALJ did not consider the fact that Plaintiff could not go to church, movies or classes when depressed.  Plaintiff also asserts the ALJ did not actually credit her son's function report as the ALJ claimed, because her son's report supported her subjective complaints of inability to function.  Plaintiff claims there are many instances in the record supporting her claims of fatigue.  Finally, in support of her credibility, Plaintiff cites to records indicating she has mild headaches from high blood pressure and missed appointments when she felt ill after medication adjustments.

The Commissioner contends the ALJ discounted some of Plaintiff's complaints because they were caused by substance abuse and family problems.  And, most importantly, Plaintiff sought infrequent treatment before entering the Pathways day treatment program and then improved with treatment.  Furthermore, the ALJ did not completely discount Plaintiff's allegations because he substantially reduced the types of work Plaintiff could perform by restricting her to work involving only simple, repetitive tasks, low stress work, defined as work that does not involve fast paced

activity or high production quotas, and brief and superficial interaction with the public, co-workers and supervisors.

Plaintiff also asserts the ALJ improperly analyzed her drug and alcohol use in determining her RFC.  Instead, the ALJ should have determined whether her drug and alcohol abuse was a material factor contributing to disability, pursuant to 20 C.F.R. § 416.935.  Plaintiff asserts she remained sober up to one year but was still limited by her mental illness; therefore drug and alcohol abuse was not material to disability.  In response, the Commissioner asserts the ALJ properly discounted Plaintiff's credibility because she gave conflicting accounts of her recent drug and alcohol use.  The Commissioner argues that although the ALJ found that Plaintiff's substance abuse contributed to her mental limitations, he did not find that Plaintiff was disabled when her mental illness and substance abuse were considered together.  Thus, the ALJ did not have to do the additional analysis under 20 C.F.R. § 416.935.

Under 20 C.F.R. § 416.935, the ALJ must first determine whether the claimant is disabled without segregating out any effects that might be due to substance use disorders.  *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003).  Here, the ALJ did not determine disability without segregating out any effects that might be due to substance use disorders.  The ALJ stated: "[evidence] showed the claimant continues to struggle with drug and alcohol abuse and suggest that her alleged limitations are not solely from mental impairments."  The ALJ may not first discount Plaintiff's subjective complaints because they are attributable to substance abuse, and then determine whether Plaintiff is disabled.  The ALJ must determine disability first, without segregating out any effects of substance use disorders, and then determine if the claimant is disabled, and whether drug or alcohol abuse are material factors contributing to disability. *Brueggemann*, 348 F.3d at 694-95.

26

The ALJ did not cite the pertinent regulation, leaving open the possibility that the regulation was ignored.  Plaintiff has a very long history of substance abuse, and her treatment at Pathways was for the dual purpose of treating mental health symptoms and drug and alcohol abuse.  There was much evidence in the record suggesting Plaintiff continued to struggle with sobriety, and suggesting that, in this struggle, she may have been abusing prescription drugs.  Depression and anxiety were triggers for her to use alcohol, making the cause and effect determination very difficult.  Additionally, Plaintiff and her son indicated that part of the reason she could not work was that her medications made her too tired, and in her son's words, "spaced out."  The ALJ credited Plaintiff's son's report, without any analysis.  It is relevant to the determination in this case whether Plaintiff was abusing prescription medication or if she was properly taking medication as prescribed, and the side effects of the medication affected her functioning.  The ALJ made conflicting findings on this issue.

In sum, the ALJ did not first determine disability without segregating out the limiting effects that might be due to alcohol and drug abuse, and then determine whether alcohol and drug abuse was a contributing factor material to disability.  This is an important step, because if the ALJ cannot determine whether Plaintiff would remain disabled in the absence of substance abuse, Plaintiff would be entitled to benefits.  *Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010).  When the claimant is actively abusing drugs, the inquiry is hypothetical, and more difficult.  *Id.*  Under these circumstances, remand is required for the ALJ to follow the procedure for addressing drug and alcohol abuse under 20 C.F.R. § 416.935.  Notably, there is evidence that even when treatment at Pathways was going well for Plaintiff, she was overwhelmed by making phone calls and completing paperwork necessary to provide for her basic needs.  When her treatment ended, she again reported suicidal thoughts.  At the same time, there was evidence Plaintiff was abusing

prescription drugs.  It is a difficult inquiry for the ALJ, but it must be made.

### 2.      Mental Health Provider Opinions

Plaintiff second argument is that the ALJ erred by failing to address certain medical

opinions and erred in the weight granted to Dr. Butler's medical opinion.  She contends the ALJ

should have given greater weight to Andrea Mousel's opinion.[12]  Mousel opined that Plaintiff had

significant limitations from depressed mood and panic attacks affecting all areas of life, particularly

daily tasks, concentration, and socializing with others.  In sum, Plaintiff contends the ALJ erred by

failing to analyze or weigh the applicable factors regarding Mousel's opinion.

The Commissioner responded that Mousel, as an LMFT, is not an acceptable medical source

whose opinion might be entitled to controlling weight or for whom the ALJ must discuss, as

opposed to merely consider, each of the factors under 20 C.F.R. § 404.1527(d).  Furthermore, the

Commissioner points out that Mousel's opinion reflected Plaintiff's condition before she engaged

in the Pathways program, and her condition improved with treatment at Pathways.  In reply,

Plaintiff argues the case must be remanded because a licensed psychologist is an acceptable

medical source whose opinion must be considered and weighed by the ALJ, and Richard Stouder is

a licensed psychologist whose evaluation the ALJ did not consider.  Plaintiff further asserts the ALJ

should have considered Moore's and Mousel's opinions and addressed the Pathways records in

more depth.

Under the regulations, only an acceptable medical source's opinion must be assessed to

determine whether it is entitled to controlling weight.  *Tindell v. Barnhart*, 444 F.3d 1002, 1005

---

[12]  In her memorandum in support of summary judgment, Plaintiff misidentified the opinion
found at Tr. 405-408 as Teresa Moore's opinion.  In her reply, Plaintiff concedes it is Andrea
Mousel's opinion (Tr. 401-08), and she also relies on Teresa Moore's and Richard Stouder's
rehabilitation plan (Tr. 409-17) and Moore's treatment records.

(8th Cir. 2006); 20 C.F.R. §§ 416.902; 416.913; 416.927. Acceptable medical sources include

licensed physicians, licensed or certified psychologists and other specialties. 20 C.F.R. § 416.913.

There is no indication in the record that Andrea Mousel or Teresa Moore are licensed

psychologists. Although they are licensed, they are licensed as therapists, a term that falls under

"other sources" in the regulations. 20 C.F.R. § 416.913(d)(1). "Other source" opinions may be

used "to show the severity of your impairment(s) and how it affects your ability to work. *Id.* §

913(d). However, the ALJ must consider all opinions in the record and, if a treating physician's

opinion is not granted controlling weight, the ALJ must weigh the opinions, applying the factors of

1) length and nature of the treatment relationship and frequency of examination; 2) nature and

extent of the treatment relationship; 3) supportability of the opinion by the record; 4) consistency of

the evidence with the record as a whole; 5) specialization; and 6) other factors raised. 20 C.F.R. §

416.927(c)(1-6).

Here, the ALJ did not address Mousel's opinions contained in the intake diagnostic

assessment she completed in relation to Plaintiff's participation in the Pathways program. The form

required Mousel to check a box to indicate whether a particular functional area posed "no

problem," "slight problem," "moderate problem," "severe problem," or "extreme problem." (Tr.

407.) She checked severe problem for mental health symptoms, noting "depression inhibits

performance of all areas of life, her panic attacks paralyze her motivation to do daily tasks." (*Id.*)

She checked severe problem for social functioning because Plaintiff said she did not have any

friends at that time. (*Id.*) She also checked severe problem for interpersonal functioning because

Plaintiff had a difficult time using assertive communication skills and setting appropriate

boundaries. (*Id.*)

The ALJ did not address the functional assessment portion of Plaintiff's Individual

Rehabilitation Plan, signed by Teresa Moore and Richard Stouder on June 24, 2010.  (Tr. 409-17.)

In the rehabilitation plan, Plaintiff's mental health symptoms, identified as severe problems, were

anxiety, "unmotivated," confusion, and overwhelmed.  (Tr. 410.)  This was explained by Plaintiff's

report to her providers that when she is depressed, she struggles with motivation to make and return

phone calls, and she becomes anxious, confused, overwhelmed and struggles to leave her house, go

to church or do laundry, instead, tending to stay in bed.  (*Id.*)  The remainder of her problems were

categorized as moderate, including her drug and alcohol problems.  (Tr. 411.)  Plaintiff said

depression made it difficult for her to manage her cravings.  (*Id.*)

Plaintiff also contends the ALJ erred by adopting Dr. Butler's RFC opinion because she had

not reviewed the Pathways records.  The Commissioner contends it was Plaintiff's fault because she

wanted to go forward with the hearing knowing that the Pathways records had not been received,

and the ALJ preferred to wait until the record was complete to hold the hearing.[13]  The

Commissioner also asserts that because the Pathways records show Plaintiff improved, they would

not have changed Dr. Butler's opinion.  Finally, the Commissioner argues Dr. Butler properly

found that Plaintiff did not have severe impairments of schizophrenia, ADHD, organic personality

disorder, cognitive dulling or alcohol-related cognitive deficits because these diagnoses were not

supported by testing or signs or symptoms.

The ALJ's failure to discuss or even mention the opinions of Plaintiff's mental health

providers from Pathways demands remand.  An ALJ must weigh every medical opinion.  *See*, 20

C.F.R. § 416.927(b) ("[w]e will always consider the medical opinions in your case record together

with the rest of the relevant evidence we receive.")  The opinions and the Pathways treatment

records are particularly relevant to disability because Plaintiff was treated multiple days a week in

---

[13]  Tr. 28-29.

group and individual therapy for substance abuse and mental disorders. Before her treatment at Pathways, Plaintiff's treatment was not consistent, and her psychiatrist had a difficult time diagnosing her because she was not clear in expressing her symptoms. The records from Pathways present a much clearer picture, and the ALJ provided very little discussion of the records, and no discussion of the opinions contained in the records.

For similar reasons, the ALJ erred by relying on Dr. Butler's opinion because Dr. Butler had not reviewed the Pathways records. The ALJ also gave significant weight to Dr. Karayusuf's opinion and some weight to Dr. Horton's opinion. Neither of these medical sources had the benefit of reviewing the Pathways records before giving their opinions of Plaintiff's RFC. When an ALJ considers the weight to give a medical source opinion, he should consider the extent to which the source was familiar with the other information in the case record. 20 C.F.R. § 416.927(c)(6). Thus, remand is required for the ALJ to weigh the opinions contained in the Pathways records, and for the ALJ to consider the extent to which the sources were familiar with other information in the case record. On remand, the ALJ may wish to have a medical expert review the Pathways records.[14]

The Court, however, agrees with the Commissioner that Dr. Butler did not err by opining that certain diagnoses in the record did not reflect severe impairments, because they were not supported by objective testing, signs or symptoms. "Proof of a disabling impairment must be supported by at least some objective medical evidence." *See, Marolf v. Sullivan*, 981 F.2d 976, 978 (8th Cir. 1992) (citing 20 C.F.R. § 404.1529); *see also,* 20 C.F.R. § 416.929(a) ("there must be

---

[14] Although this Court believes remand is required for an error occurring before the ALJ reached step five of the disability evaluation process, the Court notes Plaintiff's step-five argument, at best, presents harmless error. If a person who is incapable of infrequent interactions with others, as found by the ALJ, cannot perform the occupation of dining room attendant, the ALJ identified two other occupations such an individual could perform that do not require more than infrequent interactions with others. *See,* supra notes 9, 10, and 11.

medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged . . .")  Plaintiff's diagnosis of ADHD was often labeled "a history of ADHD," and all references to schizophrenia or schizoaffective disorder were historical.  Furthermore, there is nothing in Dr. Ebrahimi's records to explain his diagnoses of organic personality disorder, cognitive dulling or alcohol-related cognitive deficits.  There is no evidence of testing or even signs and symptoms pointing to traumatic brain injury or alcohol-related brain injury.  Dr. Ebrahimi expressed his frustration with finding a diagnosis for Plaintiff and stated there was no diagnosis to adequately capture her problems.  Given this background, it was proper for Dr. Butler to discount diagnoses in the record that were either historical or for which there was no testing and no signs or symptoms supporting the diagnoses.  However, if Plaintiff has prior evidence of testing, signs or symptoms to support any of these diagnoses, the evidence should be submitted for consideration upon remand in this case.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, IT IS HEREBY

RECOMMENDED THAT:

1.   Plaintiff's Motion for Summary Judgment **(#18) be granted for remand;**

2.   Defendant's Motion for Summary Judgment **(#24) be denied;**

3.   The case be remanded pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation;

4.   The case be DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.

DATED:  February 7, 2014

*s/Franklin L. Noel*
FRANKLIN L. NOEL
Unites States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before February 21, 2014, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.